# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **WINFRED D. RAMEY,** ) | |
| ) | **Case No. 10 CV 8195** |
| **Plaintiff,** ) | |
| **v.** ) | **Magistrate Judge Young B. Kim** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | **September 26, 2011** |
| **Defendant.** ) | |

## MEMORANDUM OPINION and ORDER

Plaintiff Winfred Ramey ("Ramey") seeks review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Before the court are the parties' cross-motions for summary judgment. Ramey asks the court to reverse the Commissioner's decision and award benefits, or in the alternative, to remand the case for further proceedings. The Commissioner seeks an order affirming the decision. For the following reasons, Ramey's motion for summary judgment is granted insofar as it requests a remand and the Commissioner's motion is denied:

## I. Procedural History

Ramey applied for DIB and SSI on June 2, 2005, alleging that he became disabled on January 26, 2005, due to diabetes, kidney failure, poor circulation, and back problems. (Administrative Record ("A.R.") 16, 87-89, 394-99, 410.) His applications were denied

initially on August 30, 2005, (id. at 40-44), and again on reconsideration on January 6, 2006, (id. at 49-52, 407-10). Thereafter, Ramey requested and received a hearing before an administrative law judge ("ALJ"). (Id. at 54, 575-612.) One month after the hearing, on January 12, 2007, the ALJ issued a decision finding Ramey not disabled. (Id. at 415-23.) The Appeals Council granted Ramey's request that it review the ALJ's decision, and on September 28, 2007, it vacated the ALJ's decision and remanded the case for further proceedings and a new decision. (Id. at 427-28.)

The ALJ held a second hearing in February 2009, and on March 3, 2009, the ALJ issued a second decision again finding Ramey not disabled. (Id. at 16-25.) This time the Appeals Council denied Ramey's request for review, making the ALJ's decision the final decision of the Commissioner. (Id. at 5-7.) *See Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Pursuant to 42 U.S.C. § 405(g), Ramey initiated this civil action for judicial review of the Commissioner's final decision. The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

## II. Background

### A.    Summary of Medical Evidence

Ramey, who is now 54 years old, suffers from insulin-dependent diabetes mellitus, hypertension, cerebrovascular disease with residual left-sided weakness as a result of a stroke, chronic obstructive pulmonary disease, chronic lower back pain, and chronic left leg pain and swelling. (A.R. 19, 638-39, 647.) His problems began in January 2005, when he

was injured in a car accident and sought emergency medical treatment for left-sided neck and lower back pain. (Id. at 160, 162.) An x-ray evaluation of the cervical and lumbar spines showed mild narrowing of the intervertebral disc space, minimal degenerative changes, and mild spurring. (Id. at 170.) Ramey was diagnosed with acute cervical spine and lumbosacral spine contusions and prescribed pain medication. (Id. at 163.)

In June 2005, Ramey suffered a stroke. He reported to an emergency room with left-sided weakness and blurry vision, and he complained that he was dropping things. (Id. at 182-84, 190.) Following an initial examination, Ramey was hospitalized for a two-week period. He had numerous diagnostic tests—including chest x-rays, electrocardiograms, Doppler testing, and CT and MRI scans—which produced abnormal results. (Id. at 215-23, 302, 304-06.) In particular, MRI scans of Ramey's brain showed atrophy and "[w]hite matter findings consistent with chronic ischemia" (restriction in blood flow). (Id. at 216-17, 221.) Furthermore, an MRI of the cervical spine confirmed the earlier diagnosis of mild intervertebral disc degenerative changes. (Id. at 223.) Other tests showed that Ramey had an enlarged heart and markedly reduced lung capacity. (Id. at 207, 215.)

Ramey's doctors also diagnosed him as suffering from multiple problems in his lower extremities likely related to his stroke and diabetes. For example, he was experiencing significant venous stasis (slow blood flow in the veins) with varicose veins and edema on the left side and poor peripheral pulses in the feet. (Id. at 184-85.) He exhibited decreased strength in his left leg, causing a lack of coordination of movement. (Id. at 188.) Ramey

underwent physical therapy in an attempt to strengthen his left leg. (Id. at 201.) While hospitalized, he was diagnosed with diabetes mellitus, hypertension, peripheral vascular disease (obstruction of large arteries not within the heart or brain), probable stroke, and baseline chronic obstructive pulmonary disease due to smoking. (Id. at 185, 208.)

Shortly after Ramey was released from the hospital, a state agency physician, Dr. Stanley Rabinowitz, evaluated Ramey. (Id. at 309-11.) Ramey complained to Dr. Rabinowitz that for fifteen years he had suffered from diabetes, which caused intermittent blurred vision and required him to take insulin. (Id. at 309.) He also complained of persistent balance difficulties stemming from his recent stroke. (Id.) Dr. Rabinowitz observed a number of impairments on Ramey's left side. (Id. at 310.) He noted that Ramey had moderate to severe varicose veins, particularly in his left leg. (Id.) He also noted that Ramey's left hand grip strength was 70 percent of normal strength and that his digital dexterity was mildly impaired. (Id.) Ramey displayed mild motor weakness, and decreased light touch and pinprick sensation in the left upper and left lower extremities. (Id. at 311.) Gait testing indicated a left antalgic gait (a limp used to avoid pain on weight-bearing structures). (Id.) Because of his left-sided weakness, Ramey walked with a cane for support. (Id.) Dr. Rabinowitz diagnosed a history of exertional dyspnea (breathlessness) and chronic cigarette dependency, a stroke with mild residual left hemiparesis (weakness) and a left hemisensory (loss of sensation) deficit, and insulin-dependent diabetes mellitus. (Id.)

About a month later, in August 2005, Dr. Patey Robert, a state agency physician, reviewed Ramey's medical file and completed a Physical Residual Functional Capacity ("RFC") Assessment form. (Id. at 317-24.) Dr. Robert opined that Ramey can occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Id. at 318-19.) A state agency medical consultant agreed with this assessment. (Id. at 325-26.)

Throughout the first half of 2006, Ramey sought treatment for symptoms related to his diabetes. For example, in January, Ramey had emergency medical treatment for swelling in his left lower leg that had persisted for seven to eight months. (Id. at 19, 565.) He complained that for several weeks he had endured pain in his toes that went up into his thigh. (Id. at 565.) His discharge diagnoses included chronic swelling and pain in the left leg with dilated superficial veins in his left calf. (Id. at 565-66.) That same month Ramey had diabetic foot care to treat swelling and varicosity of his left foot. (Id. at 559-60.) In May, he suffered other diabetes-related conditions, including retinopathy (damage to retina of the eye), nephropathy (disease of the kidneys), and neuropathy (nerve damage of the extremities). (Id. at 557.) And in July, a physical examination confirmed swelling of the left lower leg. (Id. at 345.)

In the fall of 2006 Ramey injured himself when he fell out of bed and hurt his left hip and head. (Id. at 346-47.) He went to the emergency room complaining of a headache and

lower back pain that radiated to his left leg. (Id. at 346-47, 350.) A CT scan of the head showed normal results, (id. at 391), and an x-ray of the left hip showed no dislocation or bony destruction, (id. at 389), but an x-ray of the left knee showed sclerosis and spurring, (id. at 390). The diagnoses included left hip and left knee contusion, lower back pain with left sciatica, and contusion to the head. (Id. at 347.)

About a year later in November 2007, Ramey sought emergency medical treatment due to dizziness caused by high blood sugar levels. (Id. at 484, 490.) The emergency room doctor gave Ramey insulin and diagnosed him with uncontrolled diabetes mellitus. (Id. at 483, 490.) Later that same month, Ramey reported to the emergency room with chest pain and acute respiratory distress. (Id. at 492, 503.) He was admitted into the hospital and underwent a number of diagnostic tests showing abnormal results. (Id. at 503-06.) For example, a chest x-ray indicated that Ramey had an enlarged heart and bilateral infiltrates of the lungs, which were worse than a prior study. (Id. at 505.) The discharge diagnoses included acute chronic respiratory failure, interstitial lung disease, dilated cardiomyopathy (heart muscle disease), diabetes mellitus, and hypertension. (Id. at 503.)

In March 2008, Ramey underwent a psychological evaluation with Dr. Mary Gardner, a licensed clinical psychologist, at the request of his attorney. (Id. at 545-49.) Dr. Gardner administered a number of diagnostic tests, which showed that Ramey has an IQ score of 69. (Id. at 547.) She assessed Ramey's IQ score as being far below what would be expected of someone with a high school education. (Id. at 549.) Ramey's reading score placed him at

a fifth through seventh grade reading level and his arithmetic score placed him at a sixth through ninth grade level. (Id. at 548.) Dr. Gardner assessed Ramey as having a cognitive disorder not otherwise specified and a depressive disorder not otherwise specified. (Id. at 549.) She opined that it is unlikely that Ramey would be able to "sustain meaningful employment given the nature of his medical and cognitive problems." (Id.) Dr. Gardner determined that Ramey meets Listing 12.02 for Organic Mental Disorders and Listing 12.04 for Affective Disorders. (Id. at 527, 528, 530, 537.) And Dr. Gardner assessed Ramey as being moderately limited and markedly limited in a total of 14 out of 20 functional areas relevant to his mental capacity to perform work activities. (Id. at 541-42.)

B.     **Ramey's Testimony**

At the second hearing before the ALJ, Ramey testified that his work history included jobs as a medical van driver and dietary aide. (A.R. 618-19, 621-22, 648-49.) Ramey worked as a medical van driver from 1990 to 2005, a job which required him to transport patients to and from medical clinics, and, at times, to physically lift and move patients weighing 100 pounds. (Id. at 110, 622.) Shortly before the hearing, Ramey began working about 10 to 15 hours per week as a dietary aide at a hospital. (Id. at 618-19, 648-49.) In that job, he worked in the kitchen preparing and serving food. (Id. at 648.) Ramey typically lifted plates of food weighing less than 10 pounds, (id. at 619), and the heaviest amount he lifted and carried in his work was 50 pounds, (id. at 619, 648-49). He testified that he had difficulty with his part-time job because it was fast-paced and he could not keep up. (Id. at

642.)  He would become short of breath and was in pain all of the time.  (Id.)  Ramey was

told he was too slow, but he could not speed up due to unbearable pain and his need to sit

down periodically.  (Id.)

Ramey described the multiple physical limitations he thought would interfere with his

ability to work.  He explained that the pain in his left leg and back prevents him from sitting

or standing for more than 15 or 20 minutes.  (Id. at 623.)  Ramey is able to walk about half

a block, but becomes tired and has pain in his left leg, which causes him to limp.  (Id. at 626-

27, 629.)  He has numbness in both of his hands and is unable to make a fist with his left

hand, making it hard for him to lift or carry small items without dropping them.  (Id. at 628,

630, 642-43.)  After his stroke, Ramey has had problems with his memory and he has to write

things down in order to remember them.  (Id. at 643-44.)  When he is sleeping and sitting

down at home, he elevates his feet because they are less painful that way.  (Id. at 640-41.)

Swelling often makes it difficult for Ramey to wear a shoe on his left foot.  (Id. at 641.)  He

is sensitive to light and noise and sometimes he cannot watch television because it is too

bright.  (Id. at 631-32.)  Ramey can no longer tolerate being around household fumes or

smells because they make him feel sick.  (Id. at 643.)  And when Ramey gets tired during the

day, he can sit down, but cannot fall asleep because the pain is "so bad."  (Id. at 644.)

C.    **Medical Expert's Testimony**

A medical expert, Dr. Chukwuemeka Ezike, was present for Ramey's testimony and

discussed Ramey's ability to work based on his examination of the medical record.  Dr. Ezike

explained that Ramey's medically determinable impairments include a history of diabetes, hypertension, chronic obstructive pulmonary disease, status post stroke with residual weakness on the left side since June 25, 2005, chronic lower back pain, and chronic left leg pain and swelling with varicose veins.  (A.R. 638-39, 647.)  Despite this multitude of impairments, Dr. Ezike testified that Ramey's ailments individually or in combination do not meet any listed impairment.  (Id. at 639.)  Dr. Ezike opined that Ramey can perform sedentary work, with a non-exertional limitation allowing only moderate exposure to respiratory irritants, unprotected heights, and hazardous moving machinery.[1]  (Id. at 639-40.)  Dr. Ezike also explained that because Ramey has chronic left leg swelling and varicose veins, he has a medical reason for needing to elevate his leg while he is sitting down.  (Id. at 645.)  The frequency of Ramey's need to elevate his left leg depends on the severity of his symptoms but he needs to elevate his leg "as much as possible."  (Id.)  Dr. Ezike stated that ideally he should lift the leg up over the heart, but in practice that is usually not done.  (Id. at 645-46.)  He indicated that Ramey's fine manipulation problems with his left hand were related to either his stroke or diabetes.  (Id. at 646.)  And Dr. Ezike testified that Ramey's brain atrophy and left-side weakness were attributable to his stroke and that it was possible that his decrease in cognitive ability was related to the stroke.  (Id. at 647.)

---

[1]  Dr. Ezike specifically opined that Ramey can occasionally lift 10 pounds, frequently lift less than 10 pounds, sit for six hours in an eight-hour workday, and stand and walk for about two hours in an eight-hour workday.  (A.R. 639.)  He also found that Ramey could occasionally bend, squat, and climb stairs and ramps, but could never balance, or climb ropes, scaffolds or ladders.  (Id.)

**D.    Vocational Expert's Testimony**

The ALJ asked a vocational expert, Thomas Grzeski, whether an individual with Ramey's age, education, and work experience who has certain physical limitations could perform his past relevant work or, absent that, could perform any other jobs in the national, regional or local economy. (A.R. 650.) In the first hypothetical, the ALJ proposed an individual who can occasionally lift 10 pounds, frequently lift less than 10 pounds, stand and walk two hours in an eight-hour workday, and sit for six hours during an eight-hour workday, but never climb ladders, ropes, or scaffolds, crouch or crawl, or balance.[2] (Id.) That individual must avoid concentrated exposure to fumes, odors, dust, gasses, poor ventilation, noise, unprotected heights, hazardous moving machinery, and direct bright confrontation with either sunlight or bright lights. (Id. at 651.) Grzeski concluded that the hypothetical person the ALJ described could not perform Ramey's past relevant work. (Id.) However, Grzeski identified sedentary jobs that the hypothetical individual could perform prior to age 50. (Id. at 652.) Those jobs include a call-out operator (12,000 jobs), information clerk (4,000 jobs), and order clerk (1,000 jobs). (Id.)

The ALJ next varied the hypothetical question by asking Grzeski to take into account an individual who can occasionally lift 50 pounds, frequently lift 25 pounds, stand and walk at least two hours in an eight-hour workday, and sit six hours in an eight-hour workday, but

---

[2] The ALJ also posed certain postural limitations, which included the ability to occasionally climb ramps and stairs, stoop, squat, bend, kneel and occasionally grasp and hold with the left hand. (A.R. 650-51.)

in increments of 15 to 20 minutes in either sitting or standing, with the option to change position.  (Id. at 653.)  Otherwise, he posed the same postural, manipulative and environmental limitations as described in the first hypothetical.  (Id.)  Grzeski again explained that such an individual could not perform Ramey's past relevant work.  (Id. at 653-54.)  But he indicated that this individual could perform the same sedentary jobs as he identified in response to the first hypothetical.  (Id. at 654.)  Grzeski explained that there would be no significant impact on the number of jobs available if such an individual could not remain completely on task five to eight percent of the time.  (Id.)  These jobs would permit an individual to elevate his legs to a height of approximately 12 inches on a stool or other device, but if that individual needed to elevate his legs to hip height or higher, that limitation would preclude the identified jobs.  (Id. at 654-55.)

E.    **The ALJ's Decision**

The ALJ evaluated Ramey's claim under the required five-step analysis.  *See* 20 C.F.R. §§ 404.1520, 416.920.  He concluded that: (1) Ramey had not engaged in substantial gainful activity since January 26, 2005, the alleged onset date of his disability; (2) his insulin dependent diabetes mellitus, hypertension, stroke with residual left-side weakness, chronic obstructive pulmonary disease, and chronic left leg pain and swelling constitute severe impairments; (3) these impairments do not individually or collectively meet or equal a listed impairment; (4) Ramey has the RFC to perform light work with certain postural, manipulative and environmental limitations; and (5) based on this RFC he cannot perform

his previous work but can do light work as an information clerk, usher, and parking lot attendant.

The ALJ denied benefits because he concluded that the objective medical evidence supported an RFC for light work and he found Ramey's statements regarding "the intensity, duration, and limiting effects" of his symptoms not "entirely" credible. (A.R. 21.) The ALJ disbelieved Ramey's testimony that he experiences pain in his left leg and back because the medical evidence showed only mild degenerative disc disease. (Id.) The ALJ found that Ramey's part-time work is inconsistent with his testimony that he could only walk half a block and lift certain weights. (Id.) The ALJ noted that the medical records indicate that Ramey was not compliant with his prescribed diabetes medications, had not been prescribed certain pain medications, and had not been prescribed a cane. (Id.) For these and other reasons, the ALJ concluded that the medical record failed to corroborate Ramey's claimed limitations. (Id. at 22.)

## II. Analysis

Ramey challenges three aspects of the ALJ's decision in his motion for summary judgment. Ramey first argues that he is entitled to an award of benefits as of June 3, 2007, the date of his 50th birthday because, according to Ramey, Dr. Ezike's testimony that he can perform only sedentary work establishes disability as of that date. Next, Ramey claims that an award of benefits is appropriate because his need to elevate his left leg above heart level eliminates the sedentary jobs Grzeski identified at the hearing. Lastly, Ramey asserts that

12

the ALJ failed to properly evaluate whether his mental limitations are consistent with any listed impairment.

This court must confine its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and determine whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

A.    **Leg Elevation Issue**

Ramey contends that the ALJ erroneously rejected Dr. Ezike's testimony regarding his need to elevate his left leg during the day. (R. 18, Pl.'s Mem. at 8-11.) At the hearing, Ramey testified that the chronic swelling in his left leg and foot require him to elevate his feet throughout the day to ease the swelling-induced pain. (A.R. 640.) He argues that he is entitled to an award of benefits because this testimony eliminates the sedentary jobs Grzeski identified at the hearing. (R. 18, Pl.'s Mem. at 10-11.) The Commissioner defends the ALJ's

analysis by arguing that Ramey testified he elevated his legs while he was at home (as opposed to when he was working at his current job) and no doctor opined that he needed to elevate his legs at all, let alone above heart level. (R. 20, Def.'s Resp. at 9.)

This court agrees with Ramey that the ALJ erroneously rejected Dr. Ezike's testimony regarding Ramey's need to elevate his left leg. Dr. Ezike specifically testified that Ramey has a medical reason for needing to elevate his legs, and even stated that he should elevate them "as much as possible." (A.R. 645.) But despite Dr. Ezike's testimony, the ALJ found that "[a]lthough the medical expert testified that [Ramey] would need to elevate his legs as much as possible, this restriction was given secondary to <u>current</u> leg swelling for which the current cause was not defined. There was no persistent condition in the medical record or EMG." (Id. at 22 (emphasis in original).)

Contrary to the ALJ's explanation, there is ample record evidence supporting Ramey's chronic left leg and foot swelling, which dates back to as early as June 2005 and continues throughout the longitudinal history of this case. (Id. at 184-85, 310, 345, 565-66, 559-60.) For example, the treatment records show that Ramey had significant venous stasis with varicose veins and edema on his left side in June 2005, (id. at 184-85), which was consistent with Dr. Rabinowitz's finding of moderate to severe varicose veins in his left lower leg in July 2005, (id. at 310). In January 2006, Ramey was treated in the emergency room for chronic swelling and pain in his left leg with dilated superficial veins in his left leg. (Id. at 565-66.) That same month, he had diabetic foot care to treat swelling and varicosity of his

left foot. (Id. at 559-60.) And in July 2006, Ramey was diagnosed with swelling of the left lower leg. (Id. at 345.) Thus, the medical evidence is consistent with Dr. Ezike's testimony and there is no other basis on which to conclude that his opinion was tied only to the *current* left leg and foot swelling as of the February 2009 hearing.

Here, the ALJ's determination that the leg elevation requirement was not related to Ramey's chronic condition was based on speculation. He did not ask Dr. Ezike what caused the swelling or otherwise attempt to identify when and why the elevation requirement was necessary. *See White ex. rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) (speculation is "no substitute for evidence, and a decision based on speculation is not supported by substantial evidence"). And significantly, the ALJ's determination is contrary to his own finding that Ramey's chronic left leg pain and swelling constitute a severe impairment. (Id. at 19.) Thus, the ALJ erroneously rejected Dr. Ezike's opinion and made his own independent medical finding that there was no cause for Ramey's chronic swelling. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"). The ALJ's speculation simply does not "provide an accurate and logical bridge between the evidence and the conclusion that the claimant is not disabled." *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (internal quotation omitted).

The extent to which the ALJ's error is harmful turns on how high Ramey must elevate his left leg because only the argument to elevate his leg above his heart would preclude the

jobs Grzeski identified. When asked how high an individual with edema and varicose veins should elevate his leg, Dr. Ezike testified that "ideally, you would want the, the leg to be lifted up over the heart; but in practice, it's usually not done . . . you can't do that." (A.R. 645-46.) Because there is no medical opinion indicating what height Ramey would need to elevate his legs to accommodate his chronic left leg swelling, on remand the ALJ should flesh out with the medical expert exactly how often and how high Ramey needs to elevate his leg. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) ("the ALJ has a duty to develop a full and fair record" and "[f]ailure to fulfill this obligation is good cause to remand for gathering of additional evidence") (internal quotation and citation omitted).

**B.    Mental Impairment Issue**

Ramey also persuasively argues that the ALJ improperly rejected the validity of Dr. Gardner's findings regarding his mental limitations. At the hearing, Ramey testified that following his stroke his memory was poor and he had trouble remembering and comprehending things. (A.R. 643-44.) Dr. Gardner tested Ramey's cognitive ability and found that he has an IQ score which is far below what would be expected of someone who graduated from high school. (Id. at 547, 549.) His reading and math skills fell below high school level. (Id. at 548.) Dr. Gardner diagnosed Ramey as having a cognitive disorder not otherwise specified as well as a depressive disorder not otherwise specified, and opined that these impairments meet Listings 12.02 and 12.04. (Id. at 527, 528, 530, 537, 549.)

Significantly, she opined that it is unlikely that Ramey would be able to "sustain meaningful employment given the nature of his medical and cognitive problems." (Id. at 549.)

Here, the ALJ discredited Dr. Gardner's assessment of Ramey's mental limitations for improper and unsupported reasons. For example, the ALJ found that while Dr. Gardner identified a significant discrepancy between Ramey's high school education and his IQ scores, he noted that there was no medical evidence of any past injury in the record that would explain the reason for the discrepancy. (Id. at 22.) That is incorrect; there was evidence in the record of a past injury—Ramey's stroke in June 2005 and subsequent MRI findings of atrophy and chronic ischemic changes in his brain. (Id. at 217, 221.) At the hearing, Dr. Ezike specifically testified that Ramey's brain atrophy was attributable to his stroke and his decrease in cognitive ability possibly was related to the stroke. (Id. at 647.) And notably, the ALJ's finding here contradicts his step-two finding that Ramey has suffered from cerebrovascular disease since June 2005, a condition which the ALJ himself found was verified by an MRI indicating brain atrophy. (Id. at 19.) Thus, contrary to the ALJ's findings, there is ample medical evidence that may explain the discrepancy between his high school performance and his current IQ.

The remaining reason given by the ALJ for rejecting Dr. Gardner's findings is likewise lacking in merit. Specifically, the ALJ said that Ramey's erroneous report to Dr. Gardner that he had a stroke in November 2007, as opposed to June 2005, somehow discredits the validity of her assessment of his mental limitations. (Id. at 22.) In light of the

17

fact that Ramey testified that he has memory problems and must write things down to remember them, it is not surprising that he incorrectly remembered what year he suffered a stroke. (Id. at 643-44.) It is unclear how Ramey's misstatement could have any bearing on the value of Dr. Gardner's findings. And importantly, the ALJ also failed to analyze those portions of Dr. Gardner's assessment that showed Ramey was moderately limited and markedly limited in a total of 14 out of 20 functional areas pertaining to his mental capacity to perform work activities. (Id. at 541-42.); *see Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (an ALJ must consider "*all* relevant evidence" and may not analyze only that information supporting the ALJ's final conclusion (emphasis in original)); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (it is not enough for the ALJ to selectively address portions of a doctor's report).

The Commissioner's defense of this aspect of the ALJ's decision relies on precluded post-hoc rationalizations. For example, the Commissioner asserts that Ramey never alleged that he had any difficulty performing his current job due to memory or concentration problems and that Dr. Gardner's opinion was contradicted by Dr. Ezike's opinion that Ramey's impairments do not meet any listing. (R. 20, Def.'s Resp. at 12.) The ALJ never articulated these reasons for discrediting Dr. Gardner's assessment and the Commissioner's after-the-fact contentions are not a substitute for the analysis the ALJ should have performed. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of

administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.")

To the extent the Commissioner is arguing that any error in the ALJ's reliance on Ramey's misstatement regarding the timing of his stroke is harmless, that argument also fails. That there may be valid reasons for the ALJ's rejection of Dr. Gardner's assessment does not establish that the ALJ's decision would have been the same if he did not rely on this invalid reason. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("[T]he fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless. Had she considered it carefully, she might well have reached a different conclusion."). Because the ALJ failed to offer good reasons for rejecting Dr. Gardner's assessment, a remand on this issue is warranted. The ALJ must reevaluate Ramey's mental limitations and determine if his impaired cognitive ability meets any listing or is otherwise disabling either in itself or in combination with his other impairments.

## C.    Grid Issue

Ramey argues that the ALJ's decision should be reversed and the case remanded for an award of benefits under the Medical-Vocational Guidelines (the "Grid"), as of June 3, 2007, the date of his 50th birthday. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. (R. 18, Pl.'s Mem. at 6-8.) He contends that while the ALJ adopted an RFC for light work, the evidence—and especially Dr. Ezike's testimony—establish that he is limited to sedentary

work. (Id. at 6.) Ramey points out that Dr. Ezike's opinion is consistent with Ramey's testimony, the medical evidence, and some of the ALJ's findings. (Id.) Most importantly, Ramey argues that the ALJ's step-two finding that Ramey suffers from residual left-sided weakness and chronic left leg pain and swelling is inconsistent with his conclusion that Ramey can stand and walk for six hours in an eight-hour workday. (Id.) Ramey thus contends that the ALJ's finding that he can perform light work is unsupported and that he is entitled to a finding of disability under Grid Rule 201.14, which directs an award of benefits when a person aged 50 to 54 with a high school education and no transferable skills is limited to sedentary work. (Id. at 7.)

In order to prevail on his Grid theory, Ramey must establish that the ALJ's RFC determination that he can perform light work is not supported by substantial evidence. "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. § 404.1545(a)(3); 416.945(a)(3). SSR 96-8p states in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent

work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7.

The ALJ made a number of errors in assessing Ramey's RFC, and in particular failed to meet the requirements of SSR 96-8p. First, the ALJ failed to explain why he discredited Dr. Ezike's testimony that Ramey is limited to sedentary work, a limitation which includes being able to walk and stand for only two hours in an eight-hour workday.[3] As discussed, there is ample medical evidence in the record to support Ramey's complaints of chronic pain, swelling, and weakness in his left leg and his left-sided weakness stemming from his stroke, but the ALJ failed to properly address this evidence and explain why he found Dr. Ezike's testimony inconsistent with the medical evidence. (*See e.g.*, A.R. 184-85, 188, 201, 310-11, 345-47, 350, 390, 557, 565-66, 559-60.) This oversight is especially problematic given his step-two finding that Ramey's severe impairments include residual left-sided weakness that

---

[3] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a); 416.967(a). As explained in SSR 83-10, the "primary difference" between sedentary work and light work is that light work entails a good deal of walking or standing while sedentary work requires only occasional walking or standing generally totaling "no more than about 2 hours of an 8-hour workday." Even if the job requires little lifting, it falls in the light category if it "requires a good deal of walking or standing." SSR 83-10, 1983 WL 31251, at *5.

stems from his stroke, and chronic left leg pain and swelling. (Id. at 19.) The ALJ should have explained what weight he gave to Dr. Ezike's opinion—particularly in light of these severe impairments—but he failed to do so. The omission leaves the court with no confidence that the ALJ properly weighed Dr. Ezike's opinion, rather than disregard it because it does not support his view of the RFC. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").

Second, the ALJ discredited Ramey's description of his impairments for reasons that mischaracterize the record. For example, the ALJ found Ramey's testimony not credible because he admitted that he occasionally lifts up to 50 pounds at his current job. (A.R. 21.) But Ramey did not testify that he could occasionally lift 50 pounds. Instead, he testified that the heaviest amount he lifted during the 10 to 15 hours per week he worked was about 50 pounds, but it was a "struggle" for him to carry that weight. (Id. at 618-19, 628-629.) Thus, there was no basis for the ALJ to conclude that Ramey could occasionally lift up to 50 pounds for one-third of an eight-hour workday. *See* SSR 83-10, 1983 WL 31251, at *5 ("Occasionally" is defined as "occurring from very little up to one-third of the time.")

Third, the ALJ noted that Ramey was not compliant with taking prescribed medications and did not follow up with prescribed medical treatment. (A.R. 21-22.) But contrary to Social Security regulations, the ALJ never questioned Ramey at the hearing about

why he failed to follow through with his prescribed treatment.  "[T]he ALJ 'must not draw any inferences' about a claimant's condition from [infrequent treatment or a failure to follow a treatment plan] unless the ALJ has explored the claimant's explanations as to the lack of medical care."  *Craft*, 539 F.3d at 679 (citation omitted).  Thus, the ALJ's decision to discredit Ramey for the perceived lack of follow-through on his treatment was improper.

In defending the ALJ's decision, the Commissioner contends that Ramey is not disabled under the Grid because he can lift more than 10 pounds, which is consistent with the ability to perform light work.  (R. 20, Def.'s Resp. at 5-9.)  The Commissioner points out that Ramey testified that he was currently working in a job which requires him to lift and carry 50 pounds.  (Id. at 6.)  The Commissioner asserts that Grzeski identified a total of 17,000 sedentary jobs and a total of 58,000 light jobs that Ramey could perform in response to hypothetical questions posed by the ALJ.  (Id. at 6-9.)  Both hypotheticals incorporated Dr. Ezike's opinions that Ramey could sit for six hours in an eight-hour workday and stand and walk for two hours in an eight-hour workday, but in the first hypothetical, the individual could lift only a maximum of 10 pounds and in the second hypothetical the individual could lift a maximum of 50 pounds.  (Id. at 6.)  Thus, according to the Commissioner, the only difference between the hypothetical questions pertains to Ramey's ability to lift, and because Grzeski identified a significant number of jobs in response to both hypothetical questions, Ramey's reliance on Dr. Ezike's opinion is misplaced.   (Id. at 8.)

Contrary to the Commissioner's contention that Grzeski identified *both* light and sedentary jobs in response to the ALJ's hypothetical questions, he in fact identified *only* sedentary jobs. (A.R. 650-54.) Grzeski specifically clarified that the jobs he identified in response to both hypothetical questions were sedentary. (Id. at 652, 654.) Given his standing and walking limitations, Grzeski found that Ramey was limited to sedentary jobs even if he was capable of lifting a maximum weight of 50 pounds. (Id. at 653-54.) Instead of identifying light jobs that Ramey could perform, Grzeski explained the process he used to reduce the total number of light and sedentary jobs for each category (i.e., call-out operator, information clerk and order clerk) to determine the number of available sedentary jobs. (Id. at 655-57.) Thus, the ALJ relied on the testimony from the vocational expert from the first hearing in finding that there are light jobs Ramey can perform. That in itself was error because it deprived Ramey of the opportunity to cross-examine the vocational expert to the availability of light jobs with respect to the new evidence submitted at the second hearing. *See Webster v. Astrue*, 580 F.Supp.2d 785, 797 (W.D. Wis. 2008) ("In the administrative hearing context, due process requires that a claimant have an opportunity to confront and cross examine adverse witnesses.") (citations omitted).

Given the errors in the ALJ's finding that Ramey can perform light work, a remand to reassess Ramey's RFC is warranted. If the ALJ determines that Ramey is limited to sedentary work, he shall assess whether Ramey is entitled to an award of benefits under the Grid as of his 50th birthday.

## Conclusion

For the foregoing reasons, Ramey's motion for summary judgment is granted insofar

as it requests a remand and the Commissioner's motion for summary judgment is denied.

**ENTER:**


_____
**Young B. Kim**
**United States Magistrate Judge**